# In the United States Court of Federal Claims

No. 15-1163

Filed: October 13, 2017[*]

*******************************************
   \*

MALCOLM PIPES,

    Plaintiff,

v.

THE UNITED STATES,

    Defendant.

*******************************************

| |
|---|
| 10 U.S.C. § 1204 (Retirement for Military on Active Duty for 30 days or less or on Inactive-duty Training); |
| 25 U.S.C. § 2501 (Statute of Limitations); |
| 28 U.S.C. § 1491 (Tucker Act Jurisdiction); |
| Air Force Instruction ("AFI"); |
|   AFI 10-248 (Fitness Program); |
|   AFI 36-2254 (Reserve Personnel Participation); |
|   AFI 36-2910 (Line of Duty Determination, Medical Continuation (MEDCON) and Incapacitation (INCAP) pay); |
|   AFI 36-3212 (Physical Evaluation for Retention, Retirement, and Separation); |
|   AFI 48-123 (Medical Examinations and Standards); |
| Rules of the United States Court of Federal Claims ("RCFC") |
|   12(b)(1) (Subject Matter Jurisdiction); |
| RCFC 12(b)(6) (Failure to State a Claim Upon Which Relief Can Be Granted); |
| RCFC 52.1 (Judgment on the Administrative Record). |

**Matthew E. Hughes**, Tully Rinckey PLLC, Washington, D.C., Counsel for Plaintiff.

**David Alan Levitt**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for the Government.

---

[*] On September 29, 2017, the court forwarded a sealed copy of this Memorandum Opinion And Final Order to the parties to redact any confidential and/or privileged information from the public version and note any citation or editorial errors that required corrections. The parties had until October 13, 2017 to file proposed redactions and/or corrections. Neither party filed redactions. The court incorporated all appropriate corrections.

**MEMORANDUM OPINION AND FINAL ORDER**

BRADEN, *Chief Judge*.

## I.   RELEVANT FACTUAL BACKGROUND.[1]

In 1983, Staff Sergeant ("SSgt") Malcolm Pipes enlisted in the United States Air Force ("USAF"). Compl. ¶ 7. Mr. Pipes served in the USAF for approximately sixteen years: seven on active duty and nine in the USAF Reserve. Compl. ¶ 7; *see also* AR at 39. Most recently, SSgt Pipes served as a Transportation Officer/Logistics Readiness Officer for the 917th Reserve Wing at Barksdale Air Force Base in Louisiana. Compl. ¶ 7.

On May 26, 2004, the USAF began to phase in stringent physical fitness standards for USAF Reserve, requiring:

> [a]ll members of the Air Force must be physically fit to support the Air Force mission. Health benefits from an active lifestyle will increase productivity, optimize health, and decrease absenteeism while maintaining a higher level of readiness. The goal of the Fitness Program (FP) is to motivate all members to participate in a year-round physical conditioning program that emphasizes total fitness, to include proper aerobic conditioning, strength/flexibility training, and healthy eating. Commanders and supervisors must incorporate fitness into the AF culture to establish an environment for members to maintain physical fitness and health to meet expeditionary mission requirements and deliver a fit and ready force. The annual fitness assessment provides commanders with a tool to assist in the determination of overall fitness of their military personnel.

3/21/16 Pl. Resp. Ex. 1 at 1–2 (Air Force Instruction ("AFI") 10-248, dated May 26, 2004) ("AFI 10-248").

To serve in the USAF Reserve, an annual fitness assessment ("FA") was required that included a "1.5 mile run for aerobic assessment." AFI 10-248 at 2, 45. In a memorandum, dated October 1, 2004, SSgt Pipes' Flight Commander informed SSgt Pipes that:

---

[1] The relevant facts discussed herein were derived from: the October 9, 2015 Complaint ("Compl."); the Appendix attached to the Government's January 27, 2016 Motion To Dismiss ("AR i, ii, 1–251, Form 40A"); Exhibits attached to Plaintiff's March 21, 2016 Response ("3/21/16 Pl. Resp. Exs. 1–4"); and the Appendix attached to the Government's October 21, 2016 Response to the court's August 30, 2016 Order. *See Moyer v. United States*, 190 F.3d 1314, 1318 (Fed. Cir. 1999) ("Fact-finding is proper when considering a motion to dismiss where the jurisdictional facts in the complaint . . . are challenged.") (citing *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988)).

Members who score in the Marginal or Poor fitness levels will be entered into the Self-paced Fitness Improvement Program (SFIP)[2] and the information will be documented on the AF Form 108 and maintained until the member scores greater or equal to numerical score, 75.

AR at 55.

On November 7, 2004,[3] SSgt Pipes failed the FA and received a "poor" rating.  AR at 30. As a result, he received verbal counseling, was enrolled in the SFIP that same day, and ordered to begin running five days per week.  Compl. ¶ 9, 13; *see also* AR at 17.

On August 7, 2005, SSgt Pipes failed a second FA and received additional verbal counseling.  Compl. ¶ 14; *see also* AR at 30.

On November 18, 2005, SSgt Pipes saw his private physician, who observed that SSgt Pipes' blood pressure was 165/105; several days later, his blood pressure dropped to 124/90. Compl. ¶ 15.

On February 5, 2006, SSgt Pipes was evaluated by a doctor from the 917th Medical Squadron and cleared for continued participation in the SFIP.  AR at 19–20.  That same day, SSgt Pipes failed a third FA and became ill during the running portion of the test.  Compl. ¶ 16; *see also* AR at 30.  Later that day, a USAF physician noted in SSgt Pipes' medical record that his blood pressure ranged between 151/94, when sitting, and 146/99, when standing.  AR at 104.  SSgt Pipes' Squadron Commander expressed concern about SSgt Pipes' high blood pressure and was concerned a vigorous fitness program could lead to injury, stroke, and heart attack.  AR at 56–57. None of these observations were disclosed to SSgt Pipes.  Compl. ¶ 16.

On May 7, 2006 and July 10, 2006, SSgt Pipes failed two more FAs.  Compl. ¶¶ 17, 18; *see also* AR at 30.

---

[2] AFI 10-248 defines the SFIP as:

A remedial intervention program recommended for traditional Reservists . . . identified with a composite poor fit score.  Since they are in a no-duty status, their participation in the FIP is not mandated.  Members are highly encouraged to take part on a voluntary basis in all available intervention programs to include individualized fitness prescription, heart rate-monitored exercise, supervised unit/fitness center physical training, and documented exercise participation to assist in administrative recommendation for those remaining poor fit >12 months[.]

AFI 10-248 at 46.

[3] The October 9, 2015 Complaint states that SSgt Pipes failed the FA on November 4, 2004. Compl. ¶ 13.  SSgt Pipes' USAF records, however, state that he failed the FA on November 7, 2004.  AR at 30.  Therefore, the court considers the reference to November 4, 2004 as a typographical error.

On September 3, 2006, SSgt Pipes became ill while running and experienced "a headache, difficulty breathing, dizziness, an impression of being overheated, and a general feeling of malaise." Compl. ¶ 19. These symptoms continued into the night, requiring him to go to the hospital around 2:00 AM on September 4, 2006. Compl. ¶ 19. SSgt Pipes was diagnosed with a Cerebrovascular Accident,[4] *i.e.*, a stroke. AR 211–33. On September 6, 2006, SSgt Pipes informed the USAF of this diagnosis. Compl. ¶ 21.[5]

On December 5, 2006, the USAF informed SSgt Pipes that he was not eligible to receive disability benefits, because his stroke did not occur during inactive duty training ("IDT").[6] Compl. ¶ 23; 10/21/16 Gov't Resp. App'x 1 at 5–6.

On February 4, 2007, a USAF doctor examined SSgt Pipes and reported that:

> SSgt Pipes sustained a significant vascular injury which caused dysarthria[7] and right-sided weakness secondary to uncontrolled hypertension.[8]
>
> \*      \*      \*
>
> According to AFI 48-123, page 54, A2.12.16, the persistent numbness of important muscle groups, and incoordination of the right extremities as well as inability to

---

[4] A Cerebrovascular Accident is "a sudden loss of brain function caused by a blockage or rupture of a blood vessel to the brain, resulting in necrosis of brain tissue and characterized by loss of muscular control, diminution or loss of sensation or consciousness, dizziness, slurred speech, or other symptoms that vary with the extent and severity of brain damage." THE AMERICAN HERITAGE MEDICAL DICTIONARY 141 (2007).

[5] The Government claims that, because Mr. Pipes never claimed the stroke was attributed to the SFIP, USAF regulations did not require an adverse event report and apparently no report was filed. ECF No. 20 ¶ 4.

[6] Section 101 of Title 10 of the United States Code defines "IDT" as:

(A) duty prescribed for Reserves by the Secretary concerned under section 206 of title 37 or any other provision of law; and
(B) special additional duties authorized for Reserves by an authority designated by the Secretary concerned and performed by them on a voluntary basis in connection with the prescribed training or maintenance activities of the units to which they are assigned.

10 U.S.C. § 101(d)(7).

[7] Dysarthria is "difficulty in articulating words due to emotional stress or to paralysis, incoordination, or spasticity of the muscles used in speaking." THE AMERICAN HERITAGE MEDICAL DICTIONARY 244.

[8] Hypertension is "persistent high blood pressure." THE AMERICAN HERITAGE MEDICAL DICTIONARY 386.

> fulfill his employment in the military service . . . would prevent continuation in his
> present traditional reserve occupation as a Wing Historian.   It is my
> recommendation that SSgt Pipes be evaluated for a medical board and eventual
> medical discharge from the Air Force Reserve Program[.]

AR at 153–54.

On that same day, a Technical Sergeant informed SSgt Pipes that he was not eligible to receive disability retirement benefits.  Compl. ¶ 24; *see also* AR at 78.

On February 4, 2007, SSgt Pipes signed a Medical Evaluation ("ME") For Military Duty Fact Sheet that, in relevant part, states:

> I understand that if not approved for retention in the Air Force Reserve because of
> a medically disqualifying non-duty related medical/dental condition(s), I'm eligible
> to have my case reviewed by the Physical Evaluation Board (PEB) solely for a
> fitness determination.  By completing and signing the "PEB Election Form," I am
> making my election to have or not have my case reviewed by the PEB.

AR at 147.

The Physical Evaluation Board ("PEB") Election Form ("PEB Election Form"), in relevant part, states:

> 1. I understand that I may request my case be forwarded to the Physical
>    Evaluation Board (PEB)[9] for review in the event I am medically disqualified
>    for worldwide duty . . . and not retained for continued military duty[.]  The
>    review by the PEB is only to determine my "fitness" for continued military
>    duty and not to determine if I am entitled to disability processing. By
>    completing and signing this form, I am making my selection for PEB
>    review.
> 2. If I elect to have my case reviewed by the PEB solely for a "fitness"
>    determination, I understand referral of my case does not constitute a

---

[9] AFI 36-3212, in relevant part, provides:

> A PEB is a fact-finding body that investigates the nature, origin, degree of
> impairment, and probable permanence of the physical or mental defect or condition
> of any member whose case it evaluates.  The disability system provides for two
> PEBs: an Informal PEB and a Formal PEB.  If either board finds a member unfit, it
> recommends appropriate disposition based on the degree of impairment caused by
> the disabling condition, the date incurred, and the member's line of duty status.  A
> PEB is not a statutory board, and there is no statute of limitations in considering
> evidence.

AFI 36-3212 at 14.

disability evaluation, and an "unfit" decision does not entitle me to disability compensation from the Air Force.

*   *   *

5. My PEB selection is indicated below:

___ I desire to have my non-duty related, medical disqualification case referred to the [Informal Physical Evaluation Board ("IPEB")[10] solely for a fitness determination.  I understand I can submit a statement for consideration by the PEB.

___ I do not desire to have my case referred to the IPEB.  I understand, in the even that [the USAF] determines I am medically disqualified for worldwide duty and I am not retained by [the USAF], I will be processed for involuntary separation without my case being reviewed by the PEB.  If I am eligible for retirement, I understand I will be afforded the opportunity to apply for retirement in lieu of separation.

AR at 146 (internal correction omitted).

On February 4, 2007, SSgt Pipes initialed next to the block of the PEB Election Form that begins "I do not desire to have my case referred to the IPEB."  AR at 146.  As a result, no review was performed by the PEB.  Compl. ¶ 26.

On November 4, 2007, SSgt Pipes' Commander informed the United States Air Force Reserve Command ("AFRC") that SSgt Pipes "has not been able to perform any duties since his stroke" and therefore should be "medically retired."  AR at 140–41.

On November 26, 2007, SSgt Pipes was determined to be "medically disqualified for continued military duty."  AR at 139.

On December 20, 2007, pursuant to AFI 36-3209, paragraph 3.14, the USAF initiated a "separation action" to discharge SSgt Pipes from the Air Force Reserve and assigned him legal counsel.  AR at 133.   In lieu of an administrative discharge, the USAF informed SSgt Pipes that he was eligible for retirement.  AR at 133.

On January 30, 2008, the USAF received from SSgt Pipes an "application for transfer to the Retired Reserve . . . in lieu of administrative discharge for physical disqualification."  AR at

---

[10] AFI 36-3212, in relevant part, provides that, "The IPEB reviews appropriate medical and personnel records, and related documentation to determine fitness for duty.  Neither the member nor counsel may be present at the informal hearing."  AFI 36-3212.

127.  The USAF noted that SSgt Pipes had "over 16 years of satisfactory services and [was] eligible for early Reserve retirement under Title 10, USC Section 12731."[11]  AR at 127.

On September 15, 2008, SSgt Pipes was assigned to the Retired Reserves, but the assignment was backdated, effective September 4, 2006.  AR at 126.[12]

On September 23, 2009, SSgt Pipes filed an application for benefits with the Department of Veteran Affairs ("VA").  Compl. ¶ 29.  In September 2010, the VA informed SSgt Pipes that his application for VA benefits demonstrated he was not evaluated for Reserve Service.  Compl. ¶ 30.

On or about October 5, 2010, SSgt Pipes obtained a copy of his USAF medical records. Compl. ¶ 30; *see also* AR at 104.  Upon review of these records, he first learned that on February 4, 2006, the USAF Medical Examiner observed that his blood pressure was abnormally high during his medical clearance exam.  Compl. ¶ 30; *see also* AR at 104.

On August 10, 2011, SSgt Pipes filed an Application For Correction Of Military Record with the Air Force Board for Correction of Military Records ("AFBCMR").  AR at 11.

On June 4, 2012, the AFBCMR issued a Memorandum "recommending denial of the change in medical records to reflect [Plaintiff] was permanently medically retired."  Compl. ¶ 34.

---

[11] Section 12731(a) of Title 10, in relevant part, provides:

(a) Except as provided in subsection (c), a person is entitled, upon application, to retired pay computed under section 12739 of this title, if the person
  (1) has attained the eligibility age applicable under subsection (f) to that person;
  (2) has performed at least 20 years of service computed under section 12732 of this title;
  (3) in the case of a person who completed the service requirements of paragraph (2) before April 25, 2005, performed the last six years of qualifying service while a member of any category named in section 12732(a)(1) of this title, but not while a member of a regular component, the Fleet Reserve, or the Fleet Marine Corps Reserve, except that in the case of a person who completed the service requirements of paragraph (2) before October 5, 1994, the number of years of such qualifying service under this paragraph shall be eight; and
  (4) is not entitled, under any other provision of law, to retired pay from an armed force or retainer pay as a member of the Fleet Reserve or the Fleet Marine Corps Reserve.

10 U.S.C. § 12731(a).

[12] SSgt Pipes, however, cannot receive retirement benefits until he is 60 years old; currently, SSgt Pipes is 58.  Compl. ¶ 28; *see also* 10 U.S.C. § 12731(f)(1) ("Subject to paragraph (2), the eligibility age for purposes of subsection (a)(1) is 60 years of age.").

On July 5, 2012, Plaintiff responded to the June 4, 2012 Memorandum by providing supplemental documentation to the AFBCMR.  Compl. ¶ 35.

On February 28, 2013, the AFBCMR denied SSgt Pipes' Application For A Correction Of Military Records, because he "did not demonstate the existence of a material error or injustice." Compl. ¶ 36; *see also* AR at 2.

On April 30, 2013, and again on July 3, 2013, SSgt Pipes requested reconsideration, but on August 11, 2014, the USAF Office of the Assistant Secretary affirmed the AFBCMR's denial. AR at 1.

## II.    RELEVANT PROCEDURAL HISTORY.

On October 9, 2015, SSgt Pipes ("Plaintiff") filed a Complaint in the United States Court of Federal Claims for "military pay, disability retirement pay, reimbursement of expenses, and other benefits," pursuant to 10 U.S.C. § 1204.[13]   Compl. ¶¶ 1, 2; ECF No. 1.   Specifically, the

---

[13] Section 1204 of Title 10 provides:

Upon a determination by the Secretary concerned that a member of the armed forces not covered by section 1201, 1202, or 1203 of this title is unfit to perform the duties of his office, grade, rank, or rating because of physical disability, the Secretary may retire the member with retired pay computed under section 1401 of this title, if the Secretary also determines that:

(1) based upon accepted medical principles, the disability is of a permanent nature and stable;

(2) the disability

    (A) was incurred before September 24, 1996, as the proximate result of--

        (i) performing active duty or inactive-duty training;
        (ii) traveling directly to or from the place at which such duty is performed; or
        (iii) an injury, illness, or disease incurred or aggravated while remaining overnight, immediately before the commencement of inactive-duty training, or while remaining overnight between successive periods of inactive-duty training, at or in the vicinity of the site of the inactive-duty training, if the site of the inactive-duty training is outside reasonable commuting distance of the member's residence;

    (B) is a result of an injury, illness, or disease incurred or aggravated in line of duty after September 23, 1996

        (i) while performing active duty or inactive-duty training;
        (ii) while traveling directly to or from the place at which such duty is performed; or

October 9, 2015 Complaint requests "[i]njunctive relief and/or declaratory relief," "[p]ayment of all wrongfully denied pay and allowances due . . . under the law, including military disability retirement pay," "[p]ayment of all out-of-pocket medical expenses," an "[a]ward of reasonable attorney fees and costs under the Equal Access to Justice Act," and "[a]ll other relief this court deems just and proper." Compl. at Section VI, Prayer for Relief.

On November 30, 2015, the Government filed an Unopposed Motion For A 45 Day Enlargement Of Time To File A Response. ECF No. 5. The court granted the November 30, 2015 Motion on December 1, 2015. On January 19, 2016, the Government filed an Unopposed Motion For Leave To File Documents Under Seal And For A Protective Order. ECF No. 6.

On January 27, 2016, the Government filed a Motion To Dismiss, pursuant to Rules of the United States Court of Federal Claims ("RCFC") 12(b)(1), for lack of subject matter jurisdiction, and 12(b)(6), for failure to state a claim on which relief can be granted. ("1/27/16 Gov't Mot.") ECF No. 7. On January 28, 2016, the court issued a Protective Order prohibiting the disclosure of personal information protected by the Privacy Act of 1974, 5 U.S.C. § 552a. ECF No. 7.

On March 21, 2016, Plaintiff filed a Memorandum Of Points And Authorities In Support Of Plaintiff's Opposition To Defendant's Motion To Dismiss ("3/21/16 Pl. Resp."). ECF No. 11. On March 22, 2016, the Government filed an Unopposed Motion For Extension Of Time By 14-

---

        (iii) while remaining overnight, immediately before the commencement of inactive-duty training, or while remaining overnight between successive periods of inactive-duty training, at or in the vicinity of the site of the inactive-duty training; or

    (C) is a result of an injury, illness, or disease incurred or aggravated in line of duty

        (i) while the member was serving on funeral honors duty under section 12503 of this title or section 115 of title 32;
        (ii) while the member was traveling to or from the place at which the member was to so serve; or
        (iii) while the member remained overnight at or in the vicinity of that place immediately before so serving, if the place is outside reasonable commuting distance from the member's residence;

(3) the disability is not the result of the member's intentional misconduct or willful neglect, and was not incurred during a period of unauthorized absence; and

(4) either

    (A) the member has at least 20 years of service computed under section 1208 of this title; or

    (B) the disability is at least 30 percent under the standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination.

10 U.S.C. § 1204.

Days To Reply.  ECF No. 12.  The court granted the March 22, 2016 Motion on March 23, 2016.  On April 21, 2016, the Government filed a Reply ("4/21/16 Gov't Reply").  ECF No. 13.

On May 18, 2016, Plaintiff filed a Motion For Leave To File Sur-Reply, attaching a Sur-Reply thereto ("5/18/16 Pl. Sur-Reply").  ECF No. 14.  On May 20, 2016, the court granted Plaintiff's May 18, 2016 Motion.  ECF No. 15.

On August 30, 2016, the court issued an Order denying the Government's January 27, 2016 Motion To Dismiss, because there were a number of jurisdictional facts at issue.  ECF No. 16.  In addition, the court requested that the Government produce six categories of records, including the February 5, 2006 USAF Medical Clearance Exam Report from the 917th Medical Squadron.  ECF No. 16.

On October 21, 2016, the Government filed a Response to the August 30, 2016 Order ("10/21/16 Gov't Resp."), informing the court that "the process in place at the time [Plaintiff] retired was to send service treatment records ("STRs") to the VA on a [service] member's separation."  ECF No. 20 ¶ 3.

On November 9, 2016, the court issued an Order requiring the VA to provide all of Plaintiff's STRs and the USAF Reserve medical records.  ECF No. 21.  On January 11, 2017, the Government filed a Notice of Compliance (1/11/17 Gov't Notice Of Compliance), informing the court that it received the requested records from the VA.  ECF No. 22.

On May 8, 2017, the Government filed a Second Motion To Dismiss ("5/8/17 Gov't Mot."), pursuant to RCFC 12(b)(1) and 12(b)(6), or, in the alternative, for Judgment On The Administrative Record, pursuant to RCFC 52, because the AFBCMR's decision denying Plaintiff's disability retirement payments was supported by substantial evidence and was not arbitrary, capricious, or contrary to law.  ECF No. 25.

On June 8, 2017, Plaintiff filed a Cross-Motion for Judgment On The Administrative Record and Response to the Government's May 8, 2017 Motion ("6/8/17 Pl. Resp.").  ECF No. 26.  On June 9, 2017, Plaintiff filed an Affidavit in support of the June 8, 2017 Response.  ECF No. 27.  On June 22, 2017, the Government filed a Reply ("6/22/17 Gov't Reply").  ECF No. 28.  On June 29, 2017, Plaintiff filed a Sur-Reply ("6/29/17 Pl. Sur-Reply").  ECF No. 29.

## III.   DISCUSSION.

### A.   Jurisdiction.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages. . . .  [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists."  *United States v. Testan*, 424 U.S. 392, 398 (1976).

Therefore, to pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, Constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act[.]"); *see also Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) ("The Tucker Act . . . does not create a substantive cause of action; . . . a plaintiff must identify a separate source of substantive law that creates the right to money damages. . . . [T]hat source must be 'money-mandating.'"). Specifically, a plaintiff must demonstrate that the source of substantive law on which he relies "can fairly be interpreted as mandating compensation by the Federal Government[.]" *United States v. Mitchell*, 463 U.S. 206, 217 (1983) (quoting *Testan*, 424 U.S. at 400). The plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question . . . [the plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.").

In this case, the October 9, 2015 Complaint invokes the jurisdiction of the United States Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491(a)(1) and 10 U.S.C. § 1204. Compl. ¶ 2. For these reasons, the court has subject matter jurisdiction over the claims alleged for disability retirement compensation therein. *See Fisher*, 402 F.3d at 1174 (holding that a similar statute, "[10 U.S.C.] § 1201[,] is understood as money-mandating").

To invoke the court's jurisdiction in a military pay case, a plaintiff also must file a complaint within six years after such a claim accrues. *See* 28 U.S.C. § 2501 (providing that actions brought under the Tucker Act are time-barred unless the claim "is filed within six years after such claim first accrues"). The Tucker Act's statute of limitations is jurisdictional. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008) ("This Court has long interpreted the court of claims limitations statute as . . . 'jurisdictional.'"). Therefore, a plaintiff's failure to satisfy the requirements of 28 U.S.C. § 2501 places a claim beyond the court's jurisdiction. *See Soriano v. United States*, 352 U.S. 270, 272 (1957) ("[T]he Congress[,] in the Act creating the Court of Claims[,] gave the Government's consent to be sued therein only in certain classes of claims and that no others might be asserted against it, including claims which are declared barred if not asserted within the time limited by the statute.") (internal quotation marks omitted).

## B. Standing.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit." *Rothe Dev. Corp. v. Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005) (internal quotations omitted). The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan v. Def.'s of Wildlife*, 504 U.S. 555, 561 (1992). Specifically,

a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is

likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180–81 (2000) (internal citations omitted).

The October 9, 2015 Complaint alleges that Plaintiff has suffered an injury in fact that: is traceable to the USAF's denial of disability retirement pay and benefits; can be determined in a specific amount; and is likely to be redressed by a favorable decision of the court. Compl. ¶¶ 42–43.  For these reasons, the court has determined that Plaintiff has standing to bring the claims alleged in the October 9, 2015 Complaint.

### C.      Standard Of Review For Motion To Dismiss Under RCFC 12(b)(1).

A challenge to the United States Court of Federal Claims' "general power to adjudicate in specific areas of substantive law . . . is properly raised by a [Rule] 12(b)(1) motion[.]" *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* RCFC 12(b)(1) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading. . . . But a party may assert the following defense[] by motion: (1) lack of subject-matter jurisdiction[.]").  When considering whether to dismiss an action for lack of subject matter jurisdiction, the court "must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff."  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).

### D.      Standard Of Review For Motion To Dismiss Under RCFC 12(b)(6).

A challenge to the United States Court of Federal Claims' "[ability] to exercise its general power with regard to the facts peculiar to the specific claim . . . is raised by a [Rule] 12(b)(6) motion[.]"  *Palmer*, 168 F.3d at 1313; *see also* RCFC 12(b)(6) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading . . . . But a party may assert the following defense[] by motion: . . . (6) failure to state a claim upon which relief can be granted[.]").

When considering whether to dismiss an action for failure to state a claim, the court must assess whether the complaint adequately states a claim and whether the plaintiff can allege facts "plausibly suggesting (not merely consistent with)" a showing of entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  The plaintiff's factual allegations must be substantial enough to raise the right to relief "above the speculative level," *id.* at 555, accepting all factual allegations in the complaint as true and "draw[ing] all reasonable inferences in favor of the non-movant."  *Julian v. United States*, 658 Fed. App'x 1014, 1016 (Fed. Cir. 2016) (quoting *Adams v. United States*, 39 F.3d 1212, 1218 (Fed. Cir. 2004).

### E.      Standard Of Review For Judgment On The Administrative Record.

Review of a military correction board's decision is "limited to the administrative record before the deciding official or officials." *Wyatt v. United States*, 23 Cl. Ct. 314, 319 (Cl. Ct. 1991). The standard for judgment on the administrative record, pursuant to RCFC 52.1, is whether the plaintiff has met the burden of proof to show that the decision was without a rational basis or not in accordance with the law, given all the disputed and undisputed facts in the administrative record.

*See Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005) (instructing the court to make "factual findings under RCFC 52.1 from the [limited] record evidence as if it were conducting a trial on the record"). Where the parties have filed cross-motions for judgment on the administrative record, RCFC 52.1 provides a procedure for parties to seek the equivalent of an expedited trial on a "paper record, allowing fact-finding by the trial court." *Id.* at 1356. Unlike summary judgment, genuine issues of material fact do not preclude a judgment on the administrative record. *See id.* at 1355–56.

The standard of review is limited to determining whether the agency decision is "arbitrary, capricious, unsupported by substantial evidence, or contrary to law." *Porter v. United States*, 163 F.3d 1304, 1312 (Fed. Cir. 1998); *see also Hoskins v. United States*, 40 Fed. Cl. 259, 271–72 (1998) ("Once a plaintiff has sought relief from a correction board . . . the plaintiff is bound by that board's determination unless he can satisfy the difficult standard of proof that the correction board's decision was illegal because it was arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation or mandatory published procedure of a substantive nature by which plaintiff has been seriously prejudiced, or money is due.") (citations omitted). The court, however, may not retry the case on the merits. *See Chayra v. United States*, 23 Cl. Ct. 172, 178 (Cl. Ct. 1991) ("While the court might disagree with the board's decision, it cannot substitute its own judgment for that of the board if reasonable minds could reach differing resolutions of the disputed matter.").

The plaintiff bears the burden of proving any deficiency by "cogent and clearly convincing evidence." *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986) (internal citations omitted). Such proof also must "overcome the strong, but rebuttable, presumption that the administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Porter*, 163 F.3d at 1316 (quoting *Sanders v. United States*, 596 F.2d 804, 813 (Ct. Cl. 1979)).

### F.   Whether The Claims Alleged In The October 9, 2015 Complaint Are Barred By The Statute Of Limitations.

#### 1.   The Government's Argument.

The Government argues that the court does not have jurisdiction to adjudicate the claims alleged in the October 9, 2015 Complaint, because the statute of limitations has run. 5/8/17 Gov't Mot. at 7. Generally, "claims of entitlement to disability retirement pay . . . do not accrue until the appropriate military board either finally denies such a claim or refuses to hear it." 5/8/17 Gov't Mot. at 7 (quoting *Chambers v. United States*, 417 F.3d 1218, 1224 (Fed. Cir. 2005)). But, when a veteran, with "knowledge of the existence and extent of his [or her] condition," declines to be heard by a medical examination board prior to discharge, "such a waiver can invoke the statute of limitations[.]" 5/8/17 Gov't Mot. at 7–8 (quoting *Real v. United States*, 906 F.2d 1557, 1562 (Fed. Cir. 1990)).

On February 4, 2007, Plaintiff signed the PEB Form declining the USAF's offer to provide a medical board. 5/8/17 Gov't Mot. at 8. If the stroke occurred in the course of the SFIP, as the October 9, 2015 Complaint alleges, "[Plaintiff] knew [that he had suffered a stroke] when the USAF processed his discharge." 5/8/17 Gov't Mot. at 8. Therefore, "when [Plaintiff] waived a medical board on February 4, 2007 . . . , or, at the latest, when he was separated from service on

September 15, 2008 . . . , he had complete knowledge of the USAF's position[.]"  5/8/17 Gov't Mot. at 8.  Therefore, Plaintiff's cause of action accrued "when he waived the medical board or at the time of discharge, when he could have challenged the USAF's position but failed to do so[.]"  5/8/17 Gov't Mot. at 9.

Like the plaintiff in *Miller v. United States*, 361 F.2d 245, 249–50 (Ct. Cl. 1966), Plaintiff insists that he was entitled to a disability discharge, because his first opportunity to present his claim was before the AFBCMR.  5/8/17 Gov't Mot. at 9.  In *Miller*, however, because the court found that the plaintiff was aware of his disability when it occurred, but did not challenge the separation proceeding, "[t]he fact that the Army's determination not to refer the plaintiff's case to a retiring board was erroneous (according to the petition) did not deprive such determination of finality or affect the running of the 6-year limitations period[.]"  5/8/17 Gov't Mot. at 9 (*see Miller*, 361 F.2d at 250).  Plaintiff also fails to challenge the USAF's separation decision as triggering accrual of his claim.  5/8/17 Gov't Mot. at 9; *see also Real*, 906 F.2d at 1563 (holding that because there was no confusion about "the nature or the extent of the disability which resulted from [the plaintiff's] wound," the statute of limitations period was not tolled)).

In sum, Plaintiff was aware of the facts surrounding the stroke on February 4, 2007, when he rejected a medical board and accepted a regular Reserve retirement, instead of challenging the USAF's determination.  5/8/17 Gov't Mot. at 9.  As such, Plaintiff's claim accrued on February 4, 2007.  5/8/17 Gov't Mot. at 9.  Therefore, because the Tucker Act's six-year statute of limitations had run when Plaintiff filed the October 9, 2015 Complaint, the court does not have subject matter jurisdiction to adjudicate Plaintiff's claims.  5/8/17 Gov't Mot. at 9.

## 2.    Plaintiff's Response.

Plaintiff responds that the October 9, 2015 Complaint is timely, because the statute of limitations period began to run on February 23, 2013, when the AFBCMR issued the denial of Plaintiff's claim for disability retirement. 6/8/17 Pl. Resp. at 11.  This is true, because the United States "Court of Federal Claims has no jurisdiction over disability retirement claims until a military board evaluates a service member's entitlement to such retirement."  6/8/17 Pl. Resp. at 11–12 (citing *Chambers v. United States*, 417 F.3d 1218, 1225 (Fed. Cir. 2005)).

Plaintiff was never offered a hearing before a statutorily authorized medical board competent to determine eligibility for disability retirement, because Plaintiff's Commander determined, without conducting a Line of Duty ("LOD")[14] investigation, that Plaintiff's stroke occurred "off duty" and therefore could not have occurred during IDT. 6/8/17 Pl. Resp. at 12–13 (citing *Real*, 906 F.2d at 1560).  Plaintiff did not waive review by a statutorily authorized board competent to determine his eligibility for disability retirement. 6/8/17 Pl. Resp. at 12.  Instead, Plaintiff opted not to challenge his fitness for duty, because his unit made that finding in December

---

[14] LOD investigations are used to determine medical benefits.  03/21/16 Pl. Resp. at 12 n.7 (citing AFI 36-2910).  "Members who are not given [LOD] determination, but are disqualified from service due to an impairment unrelated to the member's military status, are only afforded access to the disability system for fitness for duty determinations and not given the opportunity to be afforded disability benefits."  03/21/16 Pl. Resp. at 13 (citing AFR 36-3212, ¶ 8.1).

2006.  6/8/17 Pl. Resp. at 12.  In addition, the PEB Election Form Plaintiff signed provided that the purpose of the PEB review is only to determine Plaintiff's "fitness" for continued service "and not to determine if [Plaintiff is] entitled to disability processing."  6/8/17 Pl. Resp. at 12–13 (quoting AR at 146) (internal correction omitted).  Therefore, the only statutorily authorized board available to Plaintiff was the AFBCMR.  6/8/17 Pl.  Resp. at 13.  And, Plaintiff could not pursue his cause of action in the United States Court of Federal Claims until the AFBCMR finally denied his claim.  6/8/17 Pl. Resp. at 13; *see also Friedman v. United States*, 310 F.2d 381, 396 (Ct. Cl. 1962).[15]  Therefore, Plaintiff's claim did not accrue until the AFBCMR denied his claim on February 23, 2013, starting the six-year statute of limitations period.  6/8/17 Pl. Resp. at 13.

### 3.      The Government's Reply.

The Government replies that the statute of limitations period has run, because Plaintiff knew that he had suffered a stroke and was no longer fit for military service prior to his discharge, but failed to challenge the USAF's determination.  6/22/17 Gov't Reply at 6–7.  It is well-established that "[a] cause of action cognizable in a Tucker Act suit accrues . . . when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue [in the United States Court of Federal Claims] for his money.'"  6/22/17 Gov't Reply at 6 (quoting *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003)).  Yet, prior to discharge, Plaintiff knew that he suffered a stroke and was no longer fit for military service, and, as such he was ineligible for a disability retirement, if the stroke did not occur in the line of duty.  6/22/17 Gov't Reply at 6.  Nevertheless, Plaintiff waived the opportunity to be heard by IPEB and any rights of appeal he may have had for a formal PEB.  6/22/17 Gov't Reply at 6–7.  Moreover, AFI 36-3212[16] authorized Plaintiff to challenge the USAF and argue for a LOD determination.  6/22/17 Gov't Reply at 7.  These options, however, were never pursued, because Plaintiff "never contended he was on orders or engaged in IDT."  6/22/17 Gov't Reply at 7.  Instead, Plaintiff accepted regular reserve retirement, pursuant to 10 U.S.C. § 12731b, because his *physical disabilities did not incur in line of duty, i.e.,* prior to September 15, 2008.  6/22/17 Gov't Reply at 7.

The facts of this case are similar to those in *Miller* and *Huffaker*, in that Plaintiff was "well aware of the operative facts relating to his disability well before the date of discharge."  6/22/17 Gov't Reply at 7.  But, the court should bear in mind that Plaintiff, who is an attorney and was offered and utilized the assistance of another attorney provided by the USAF, was a sophisticated

---

[15] "The normal rule, where a proper administrative tribunal has denied or refused to consider a claim and further administrative remedies are permissive not mandatory, is that the judicial cause of action arises immediately upon the initial tribunal's action and does not start again upon a subsequent administrative decision affirming that holding."  *Friedman*, 310 F.2d at 396.

[16] Paragraph 3.37.2.1. of AFI 36-3212 provides:

If, upon special review, the IPEB issues an unfit finding and recommends disability separation or retirement, an AF Form 356 will be referred to the evaluee, and the case will proceed in the same manner as other unfit cases.

AFI 36-3212, ¶ 3.37.2.1.

reservist who was or should have been fully aware of his right to challenge the USAF's position and demand a hearing. 6/22/17 Gov't Reply at 7. His failure to act in a timely fashion does not toll the statute of limitations. 6/22/17 Gov't Reply at 7–8 (citing *Menominee Tribe of Indians v. United States*, 726 F.2d 718, 720–21 (Fed. Cir. 1984) ("28 U.S.C. § 2501 is not tolled by the [plaintiffs'] ignorance of their *legal rights*"); *Dion v. United States*, 137 Ct. Cl. 166 (1956) ("ignorance of [one's] legal rights does not toll the statute" of limitations)). Therefore, the October 9, 2015 Complaint is untimely and the Government's May 8, 2017 Motion to Dismiss for lack of subject matter jurisdiction should be granted. 6/22/17 Gov't Reply at 8.

### 4.    Plaintiff's Sur-Reply.

Plaintiff replies that the Tucker Act's six-year statute of limitations has not expired, because it does not accrue until a properly charged military board evaluates the service member's entitlement to retirement and Plaintiff's claim was denied by the AFBCMR on February 23, 2013. 6/29/17 Pl. Sur-Reply at 2, 9. The Government concedes that the USAF did not make a LOD determination or provide a statutorily authorized board to evaluate Plaintiff's entitlement to disability retirement. 6/29/17 Pl. Sur-Reply at 3. Instead, the IPEB evaluation was solely to determine Plaintiff's fitness for continued military duty. 6/29/17 Pl. Sur-Reply at 3. Nevertheless, the Government "completely ignores the long-standing rule established by *Friedman* [*v. United States*, 310 F.2d 381 (Ct. Cl. 1962)] that a claim for disability retirement accrues on action by the first duly authorized board," that is the AFBCMR in this case. 6/29/17 Pl. Sur-Reply at 3.

Second, the Government cites inapplicable case law to advance an adoption of an exception to the "first competent board rule." 6/29/17 Pl. Sur-Reply at 3, 6. Specifically, *Miller* and *Huffaker* are distinguishable, because they involve plaintiffs who were active duty service members. 6/29/17 Pl. Sur-Reply at 3–5. But, active duty service members "automatically receive a board that consists of two parts": the first determines fitness and the second assigns a disability rating that separates a service member, with severance pay, or retires a service member, with disability pay. 6/29/17 Pl. Sur-Reply at 6. These cases cited by the Government involve active duty service members and are not relevant to Reserve forces. 6/29/17 Pl. Sur-Reply at 6. The active duty plaintiffs in *Miller* and *Huffaker* were deemed fit for duty during the discharge process and therefore ineligible for disability retirement, but they did not challenge the determination at the time it was made. 6/29/17 Pl. Sur-Reply at 5. In this case, however, Plaintiff was "determined unfit for duty and as a reservist" was never provided an opportunity or determination to challenge his disability retirement until the AFBCMR denied his claim[.]" 6/29/17 Pl. Sur-Reply at 5.

Third, the Government's argument that Plaintiff waived his right to a formal PEB or a LOD determination is "illogical and simply impossible." 6/29/17 Pl. Sur-Reply at 6. Plaintiff was not provided with an opportunity to deny or otherwise contest or request a LOD determination and therefore could not have waived such a determination. 6/29/17 Pl. Sur-Reply at 7. The USAF only offered Plaintiff an IPEB to "determine one issue: [Plaintiff's] fitness for continued military duty." 6/29/17 Pl. Sur-Reply at 7. The fact that Plaintiff did not challenge his fitness for continued military duty cannot be construed as a refusal or waiver of his right to disability benefits. 6/29/17 Pl. Sur-Reply at 7. The Government contends that "a board that considers solely fitness for duty is legally the same as a board that can decide fitness for duty AND provide a disability rating for those conditions which ultimately leads to disability retirement." 6/29/17 Pl. Sur-Reply at 7. This argument is erroneous, because the Government conceded in the April 21, 2016 Reply that

Plaintiff's case "was handled differently than active duty or ARC members on orders[,] because he was deemed ineligible for disability processing" so the IPEB evaluation would "be processed for a fitness for duty determination *only*."   6/29/17 Pl. Sur-Reply at 7–8 (citing 4/21/16 Gov't Reply at 4).   In addition, the Administrative Record shows that "review by the PEB is only to determine [Plaintiff's] 'fitness' for continued military duty and not to determine if [Plaintiff is] entitled to disability processing."   6/29/17 Pl. Sur-Reply at 9 (quoting AR at 146) (internal correction omitted).   Therefore, the Administrative Record belies the Government's April 21, 2016 Reply, because Plaintiff "could not waive any rights to his entitlement to disability by refusing a fitness determination."   6/29/17 Pl. Sur-Reply at 8, 9.

Fourth, the Government incorrectly argues that Plaintiff should have known he was waiving his rights to a disability determination or initiated the process sooner, because he was a "sophisticated reservist" and an attorney.   6/29/17 Pl. Sur-Reply at 8.   At the time the USAF requested Plaintiff's waiver of the IPEB, he was "an acknowledged recent stroke victim with physical and mental impairment, had no particular training in military law, and was not a JAG officer."   6/29/17 Pl. Sur-Reply at 8 (citing 6/8/17 Pl. Resp. Ex. 6 at ¶ 3).   Plaintiff also was informed that the IPEB "was solely to determine his fitness for military duty and that the IPEB would not affect any other rights he might have."   6/29/17 Pl. Sur-Reply at 8–9 (citing 6/8/17 Pl. Resp. Ex. 6 at ¶ 39).   Therefore, the Government's argument that Plaintiff should have known that he was waiving the rights to a disability determination is unfounded.   6/29/17 Pl. Sur-Reply at 9.

## 5.     The Court's Resolution.

It is well-established that a cause of action "accrues as soon as all events have occurred that are necessary to enable the plaintiff to [file] suit, *i.e.*, when all events have occurred to fix the Government's alleged liability[.]"   *Martinez*, 333 F.3d at 1303 (internal quotation marks omitted). A claim for wrongful discharge accrues at the time a service member is discharged from the military.   *Id.* ("In a military discharge case, . . . the Court of Claims ha[s] long held that the plaintiff's cause of action for back pay accrues at the time of the plaintiff's discharge."); *see also Johnson v. United States*, 123 Fed. Cl. 174, 177 (2015) ("Military pay claims based on a theory of wrongful discharge accrue at the time of discharge.").   But, "[u]nlike claims for unlawful discharge, . . . *claims of entitlement to disability retirement pay* generally do not accrue until [an] appropriate military board either finally denies such a claim or refuses to hear it," *i.e.*, until the "first competent board" takes "final action."   *Chambers*, 417 F.3d at 1224–25 (emphasis added) (citations omitted).[17]   A military board is competent if it is "statutorily authorized" to hear the claim.   *See Real*, 906 F.2d at 1560.

---

[17] The "first competent board" rule states:

(a). The judicial claim for [D]isability [R]etirement [P]ay does not accrue on release from active duty but rather on final action of a board competent to pass upon eligibility for [D]isability [R]etirement [Pay] (or upon refusal of a request for such a board).

(b).  Normally, the Retiring Board is the proper board, but where the claimant has not had or sought a Retiring Board, his claim does not accrue until final action by

An exception to this rule has been recognized by the United States Court of Appeals for the Federal Circuit in a case where our appellate court considered, "[w]hether the veteran's knowledge of the existence and extent of his condition at the time of his discharge was sufficient to justify concluding that he waived the right to board review of the service's finding of fitness by failing to demand a board prior to his discharge[.]"   *Real*, 906 F.2d at 1562.   Subsequently, in *Chambers*, the application of this exception was clarified further:

> *Real* did not fashion a rule, as the government suggests, that a service member's claim accrues when he learns of his disabling condition, whether before or after discharge.  Indeed, such a rule would be untenable, given that a military board must determine eligibility for disability retirement before such a claim accrues.  There can be no waiver of board review absent an opportunity for such review, as at discharge.  Simply put, after discharge, a veteran has nothing to waive.  The appropriate inquiry under *Real*, therefore, is *whether at the time of his separation from the Army . . . , [the plaintiff] knew that he was entitled to disability retirement due to a permanent disability that was not a result of his intentional misconduct and was service-connected.*

*Chambers*, 417 F.3d at 1226 (emphasis added).

------

> the Correction Board (which in that instance stands in the place of the Retiring Board as the proper tribunal to determine eligibility for [D]isability [R]etirement [Pay]).

> (c).  A board's action (or failure to act) is not final if (i) the claimant has been misled, (ii) the board's decision is tentative and invites reopening, (iii) the armed service itself reopens the case, or (iv) there are other circumstances depriving the action or non-action of finality.

> (d). Once a final decision is had, the claim accrues, the limitations period begins to run, and there is no tolling of the statute by reason of further applications to other boards or agencies (including the Correction Board).

> (e). Once a final decision is had, adverse determinations by other boards, including the Correction Board, do not give rise to a new cause of action.

> (f). A claim for entitlement to [D]isability [R]etirement [Pay]—of the type requiring discretionary action by a board and the Secretary—is not a "continuing claim" but accrues as a whole (once it accrues).  However, other types of pay claims not dependent on a board finding—including claims for increased retirement pay because of new legislation, etc.—are "continuing" claims.

*Friedman*, 310 F.2d at 395–96; *see also Chambers*, 417 F.3d at 1225 n.2 ("A Retiring Board, now called Physical Examination Board or PEB, determines a service member's fitness for duty and entitlement to [D]isability [R]etirement [Pay] once a Medical Examination Board or MEB finds the soldier does not meet the [service]'s standards for retention under its regulations.").

Therefore, to determine if Plaintiff "knew he was entitled to disability retirement," the court first must determine whether the statutory requirements for disability retirement benefits are met, set forth in 10 U.S.C. § 1204.  *See Chambers*, 417 F.3d at 1226 ("the issue [is] whether the [plaintiff's] knowledge of the existence and extent of his condition at the time of his discharge was sufficient to justify concluding that he waived the right to board review of the service's finding of fitness by failing to demand a board prior to his discharge. . . . Such knowledge . . . must be determined by reference to the statutory requirements for disability retirement") (internal quotation marks, corrections, and citations omitted).

In this case, the Government argues that Plaintiff waived the right to board review, when he signed the PEB Election Form.  6/22/17 Gov't Reply at 6–7.  The Administrative Record, however, is not clear as to whether the USAF gave proper "consideration to the question of whether such a reference [to a Disability Retirement Board] should be made," since no LOD investigation was performed.  *See Miller*, 175 Ct. Cl. at 878 ("although the plaintiff did not himself request that his case be referred to an Army retiring board . . . the Army itself gave consideration to the question of whether such a reference should be made, and the determination was negative").  A PEB traditionally "determines a service member's fitness for duty and entitlement to disability retirement[.]"  *Chambers*, 417 F.3d at 1225 n.2.  But, in this case, the USAF prematurely determined that Plaintiff's injury did not occur in the line of duty, so it referred Plaintiff "into the [Disability Evaluation System] *solely for a fitness determination*," pursuant to Section 8E of AFI 36-3212.  3/21/16 Pl. Resp. Ex. 4 at 72 (AFI 36-3212 ¶ 8.19.2.); *see also* AR at 146 ("The review by the PEB is only to determine my 'fitness' for continued military duty and not to determine if I am entitled to disability processing. . . .  If I elect to have my case reviewed by the PEB solely for a 'fitness' determination, I understand referral of my case does not constitute a disability evaluation, and an 'unfit' decision does not entitle me to disability compensation from the Air Force.") (internal correction omitted).  Consequently, when Plaintiff was discharged into the Retired Reserves on September 15, 2008, effective September 4, 2008, he "neither requested nor [was] offered consideration by a disability board prior to discharge," to determine whether he was eligible to be retired for disability.  *See Chambers*, 417 F.3d at 1226.  Nevertheless, the Government insists that the *Real* exception applies and the statute of limitations on Plaintiff's claim accrued the day of his discharge in 2008, because Plaintiff was aware of his permanent disability at that time.  5/8/17 Gov't Mot. at 8.  In addition, Plaintiff's failure to request a disability retiring board, when he was discharged in 2008, waived his right to review by a competent board.  *Id.* at 8–9.

The appropriate inquiry in this case is whether, at the time of his separation from the USAF in 2008, Plaintiff knew he was entitled to disability retirement—even though his permanent disability was not caused by intentional misconduct and was "service-connected"—but he nevertheless waived his right to review by the IPEB.  *See Chambers*, 417 F.3d at 1226; *see also* 10 U.S.C. § 1204.  Plaintiff concedes that he was aware that he suffered from a permanent disability at the time of his discharge.  6/29/17 Pl. Sur-Reply at 13 ("[Plaintiff suffered a permanently disabling stroke on September 3, 2006[.]").  And, neither party contends that the disabling injury occurred as a result of Plaintiff's intentional misconduct or willful neglect.  More importantly, the October 9, 2017 Complaint alleged, that on two separate occasions, Plaintiff was informed by the USAF that, since his disabling injury occurred during the SFIP, he was not entitled to disability retirement, because participation in the SFIP did not qualify as IDT.  Compl. ¶¶ 23, 24.  Therefore, at the time of his discharge in 2008, Plaintiff was not aware that he was entitled

disability retirement and, based on his reliance on the USAF's misinformed or mistaken advice, he did not request review by the IPEB.  Under these circumstances, Plaintiff did not waive his right to board review and his claim is not time barred, since the October 9, 2015 Complaint was filed less than six years after the AFBCMR issued a final decision on February 28, 2013.

## G.   Whether The October 9, 2015 Complaint Fails To State A Claim On Which Relief Can Be Granted.

### 1.   The Government's Argument.

The Government argues that the October 9, 2015 Complaint fails to allege a claim on which relief can be granted, because: (1) Plaintiff's stroke did not occur in the line of duty, *i.e.*, "while performing active duty or in active duty training"; and (2) Plaintiff does not have at least 20 years of service nor is his stroke "at least 30% . . . based on the standard . . . in use by the VA at the time of the [determination]."  5/8/17 Gov't Mot. at 12, 17–18 (quoting 10 U.S.C. § 1204(2)(B), (4)(A)–(B)).

First, Plaintiff was not entitled to a LOD determination.  5/8/17 Gov't Mot. at 10.  The relevant USAF regulation is the 2002 version of AFI 36-2910, that provides:

1.4 Personnel Who May Be Subject to LOD Determinations.

1.4.1 Active Duty Air [F]orce members

1.4.2 Members of the ARC who die, incur or aggravate an illness, injury, or disease while:

1.4.2.1 On published orders for any period of time, or while on inactive duty.

1.4.2.2. Traveling directly to or from the place the member performs active duty, or inactive duty for training.

5/8/17 Gov't Mot. at 10 (quoting AFI 36-2910 ¶ 1.4).

Plaintiff's argument that the USAF deprived him of an LOD determination is incorrect, because Plaintiff was not on orders or in military status when he was engaged in the SFIP.  5/8/17 Gov't Mot. at 10.  As noted by Plaintiff's Master Sergeant ("MSgt"), "[Plaintiff] was not on orders or in a military status at the time he suffered his stroke. . . .  [I]n my experience[, the SFIP] by itself has never been considered [to require a LOD determination,] because [a service] member is not on orders or in a military status when he is exercising on his own."  5/8/17 Gov't Mot. App'x at 26–27.

Second, Plaintiff's participation in the SFIP does not qualify as IDT.  5/8/17 Gov't Mot. at 11.  IDT is defined under 10 U.S.C. § 101(d)(7) as:

(A) duty prescribed for Reserves by the Secretary concerned under section 206 of title 37 or any other provision of law; and

(B) special additional duties authorized for Reserves by an authority designated by the Secretary concerned and performed by them on a voluntary basis in connection with the prescribed training or maintenance activities of the units to which they are assigned.

10 U.S.C. § 101(d)(7).

Plaintiff's contention that a LOD proceeding would have determined that his participation in the SFIP was IDT, because it was a "special additional dut[y] authorized for Reserves . . . by the Secretary . . . and performed . . . on a voluntary basis" is incorrect, because participation in the SFIP does not require authorization by the Secretary. 5/8/17 Gov't Mot. at 11 (quoting 10 U.S.C. 101(d)(7)); *see also* Compl. ¶¶ 9–10). As noted by Plaintiff's Senior Master Sergeant ("SMSgt"):

> [S]ince the inception of [the] SFIP, it has always been a voluntary program that cannot be enforced when a military [service] member is not on orders or in a military status. It is a program that is used to encourage [service] members to remain fit for duty . . . but not something that can be made a requirement when they are off-duty like [Plaintiff] was when he suffered his stroke. Meaning, a person who is exercising on his own while off-duty has never, in my experience, been characterized to have been performing [IDT].

5/8/17 Gov't Mot App'x at 24. Since Plaintiff was not in military status or on orders when he engaged in the SFIP, the SFIP was not IDT performed in the LOD. 5/8/17 Gov't Mot. at 11–12.

Third, because Plaintiff was not in a military status or on orders when he engaged in the SFIP, he failed to satisfy the requirement of 10 U.S.C. § 1204(2)(B)(i) to demonstrate that he suffered a disability injury "in the line of duty while performing active duty or inactive duty training." 5/8/17 Gov't Mot. at 12. The USAF Secretary also has defined IDT in AFI 36-2254, *Reserve Personnel Participation*, at Ch. 4, that in relevant part, provides: "All IDT must . . . [h]ave advance written authorization from the [service] member's commander[.] A signature is required in Block III of Form 40A[.]" AFI 36-2254 ¶ 4.2.1.1. In addition, IDT must be "performed for pay and points[.]" AFI 36-2254 ¶ 4.2.1.3.

Therefore, a commander's authorization is a condition precedent for any activity performed as an IDT. 5/8/17 Gov't Mot. at 12; *see also* 5/8/17 Gov't Mot. App'x at 27 ("In order for a service member to be considered on inactive duty status, it is a requirement that he get advance approval by his commander via an AF From 40A[.] Because [Plaintiff] lacked such documentation covering the time he suffered his stroke, he was not in inactive duty status when it occurred."). The parties do not dispute that Plaintiff failed to produce a Form 40A to demonstrate that he was authorized by his Commander to engage in off-duty exercise in IDT status. 5/8/17 Gov't Mot. at 12. In addition, the USAF's fitness regulation expressly requires that the SFIP cannot be IDT without military status or a commander's authorization: "ARC members may not apply personal physical fitness activities for the purpose of obtaining participation credit for AT, UTA, IDT, or additional training periods." AFI 36-2905 ¶ 7.3.5. "Since [service members] are in non-duty status, their participation in the [S]FIP is not mandated." AFI 10-248. The SFIP is not considered as "special additional duties authorized for Reserves," because Reserves participation is encouraged, not mandated. 5/8/17 Gov't Mot. at 13; *see also* AFI 10-248 ¶ 1.12.9.4 ("Member participation in

non-duty status is encouraged."). Therefore, without a Form 40A authorizing Plaintiff to engage in the SFIP in a military status, Plaintiff could not qualify for a disability retirement. 5/8/17 Gov't Mot. at 13.

Fourth, even if Plaintiff could demonstrate he was on orders when participating in the SFIP, his claim fails, because he did not incur the stroke while participating in the SFIP. 5/8/17 Gov't Mot. at 14. The Administrative Record and the supplemental medical records establish that Plaintiff did not suffer a stroke as a result of the SFIP. 5/8/17 Gov't Mot. at 14. A medical record of Plaintiff's initial visit to the hospital generated by Plaintiff's physician on September 4, 2006 states, "[h]e was in his usual state of health until about midnight prior to hospitalization, at which time he began having these symptoms of dysarthria and right-sided weakness." 5/8/17 Gov't Mot. App'x at 79. One of Plaintiff's SMSgt also indicated that Plaintiff did not mention collapsing and/or crawling after exercising in the hours prior to experiencing a stroke. 5/8/17 Gov't Mot. at 14. This claim—made for the first time in the October 9, 2015 Complaint—is directly contrary to what Plaintiff told his doctors when he was admitted to the emergency room, received in-patient treatment, and engaged in rehabilitation following the stroke. 5/8/17 Gov't Mot. at 14. Specifically, Plaintiff's September 4, 2006 medical record reported:

> [Plaintiff] was up playing cards with some friends. He had drunk two beers. He developed the acute onset of some clumsiness and weakness of his right upper extremity. Subsequently, he also noted some clumsiness and weakness in his right lower extremity. He initially attributed the symptoms to some medication that he had been taking for an upper respiratory tract infection.

5/8/17 Gov't Mot. App'x at 23, 84.

After Plaintiff offered details of late-night drinking alcohol and playing cards with friends, he did not mention any physical collapse or persistent worsening of a headache or other pain. 5/8/17 Gov't Mot. at 15. Another medical record on September 9, 2006—five days after the stroke—also reports that "[Plaintiff] was doing well until midnight prior to the hospitalization date of 9/4/06. He began having symptoms and came to the emergency room." 5/8/17 Gov't Mot. at 16; 5/8/17 Gov't Mot. App'x at 76.

On November 26, 2006, Plaintiff was asked to describe "When, Where and How [The] Accident Happened" and he replied that he was "[o]ut with friends, about 12:30am began having clumsiness on right side, [went] to hospital – No previous problems." 5/8/17 Gov't Mot. at 16; 5/8/17 Gov't Mot. App'x at 74. Plaintiff's SMSgt remembered Plaintiff's case, but "[did] not remember [Plaintiff] ever mentioning that he suffered the stroke following performing exercise[,] pursuant to [the SFIP]." 5/8/17 Gov't Mot. at 16–17; 5/8/17 Gov't Mot. App'x 22.

Indeed, it was not until almost five years after his stroke that Plaintiff stated for the first time in his AFBCMR petition that the stoke resulted from exercise performed during the September 3, 2006 SFIP. 5/8/17 Gov't Mot. at 17; 5/8/17 Gov't Mot. App'x at 77. Accordingly, the Government concluded that the "natural conclusion from the timeline of events . . . is that [Plaintiff] contrived the claim in order to persuade the AFBCMR that he was entitled to a disability retirement[.]" 5/8/17 Gov't Mot. at 17. The stroke, however, resulted from independent events later in the day or early the next morning, not the SFIP. 5/8/17 Gov't Mot. at 17

Finally, Plaintiff fails to meet the requirement of 10 U.S.C. § 1204(4)(A)–(B), because he does not have 20 years of qualifying service or at least a 30 percent VA disability rating for the stroke. 5/8/17 Gov't Mot. at 17. The October 9, 2015 Complaint represents that Plaintiff had 16 years of service, and failed to qualify for a disability retirement under 10 U.S.C. § 1204(4)(A). 5/8/17 Gov't Mot. at 18. Second, in an Affidavit In Support Of Application For Correction Of Military Records, dated May 7, 2011, Plaintiff stated: "I am currently rated as 20% disabled by the VA, and a claim for my [stroke] remains pending with the VA." 5/8/17 Gov't Mot. at 18; 5/8/17 Gov't Mot. App'x at 38. Plaintiff contends that the stroke would have been rated in excess of 30% under VA standards, if the USAF had found that it occurred while in the LOD. 5/8/17 Gov't Mot. at 18.

### 2.   Plaintiff's Response.

Plaintiff responds that the October 9, 2015 Complaint pled sufficient facts to state a claim for disability retirement benefits, pursuant to 10 U.S.C. § 1204, *i.e.*, (1) Plaintiff suffered a permanent injury; (2) the injury was incurred while performing IDT; (3) the injury was not the result of intentional misconduct or willful neglect; and (4) the injury is rated by the VA at 30%, or higher. 6/8/17 Pl. Resp. at 13–14.

First, Plaintiff suffered a permanent injury while engaged in the SFIP. 6/8/17 Pl. Resp. at 14. The Government does not contest that Plaintiff suffered a stroke, that left Plaintiff disqualified for military duty and permanently disabled. 6/8/17 Pl. Resp. at 14. Plaintiff began the SFIP training at about 3:30 PM on September 3, 2006, and collapsed while running during the SFIP. 6/8/17 Pl. Resp. at 14–15. Several hours later, Plaintiff had a few drinks with his friends and began experiencing dexterity problems, and was subsequently diagnosed with a stroke. 6/8/17 Pl. Resp. at 15. Plaintiff initially did not relate the afternoon collapse to later symptoms, since "they were different in nature and he believed the prior episode to merely be a bout of heat exhaustion." 6/8/17 Pl. Resp. at 15. Statements from Dr. Early and Dr. Goodyear report that when Plaintiff's prior blood pressure spikes are combined with vigorous exercise, such as running, a stroke or heart attack is highly likely. 6/8/17 Pl. Resp. at 15–16 (citing AR at 45–49 (Dr. Early); 6/8/17 Pl. Resp. Ex. 11 at 77) (Dr. Goodyear)). Therefore, the Government incorrectly assumes that the stroke did not result from participating in the SFIP by stating it was not until almost five years after the stroke that Plaintiff stated, for the first time in the AFBCMR petition, that the stoke resulted from exercise performed during the SFIP earlier that day. 6/8/17 Pl. Resp. at 16. The Government relies on Plaintiff's SMSgt's interpretation of a limited medical record addressing only what Plaintiff reported at the emergency room. 6/8/17 Pl. Resp. at 16.

In addition, Plaintiff's entire medical squadron had been updated with his medical situation in December 2006. 6/8/17 Pl. Resp. at 16. In fact, the Government's physician, Colonel Savory, has admitted that Plaintiff's stroke was caused by the SFIP. 6/8/17 Pl. Resp. at 17 (citing AR at 151–54 ("On September 4, 2006, [Plaintiff] noted a right sided weakness and 'clumsiness' with lack of coordination. This started approximately mid-day and as the day progressed he noted he had increasing problems signing his name.")). Diagnostic Notes, dated February 4, 2007, also report that Plaintiff suffered a stroke, due to high blood pressure caused by elevated homocysteine levels and vasospasms. 6/8/17 Pl. Resp. at 17. In addition, the February 4, 2017 Diagnostic Notes report that the stroke occurred mid-afternoon, during the SFIP run, and not later in the day. 6/8/17 Pl. Resp. at 17.

Second, as to the IDT requirement, Plaintiff responds that the stroke falls within the definition of IDT, because his participation in the SFIP was ordered by the Command and sufficient facts have been alleged to establish that Plaintiff was performing IDT at the time of his stroke. 6/8/17 Pl. Resp. at 19.  Specifically, the SFIP is "*special additional duties* authorized for Reserves by an authority designated by the Secretary concerned and performed by them on *a voluntary basis* in connection with the pre*scribed training or maintenance activities of the units to which they are assigned*," 6/8/17 Pl. Resp. at 19 (quoting 10 U.S.C. § 101(d)(7)), *i.e.*, because Plaintiff "*received orders to participate* in the SFIP and was expected to meet the daily SFIP requirements." 6/8/17 Pl. Resp. at 19.

On November 4, 2004, Colonel Moton enrolled Plaintiff in the SFIP after he failed the FA.  6/8/17 Pl. Resp. at 20.  Plaintiff received a letter enrolling him in the SFIP that included an attachment—a page with the required frequency and performance standards applicable to Plaintiff for each of the specified exercises.  6/8/17 Pl. Resp. at 20.  Despite the court's August 30, 2016 Order requesting the November 4, 2004 letter, the USAF failed to produce this document.  6/8/17 Pl. Resp. at 20.  Since, the Government does not contest that Plaintiff was enrolled in the SFIP or that such a letter was issued, the court is entitled to assume the allegations in the Complaint are accurate.  6/8/17 Pl. Resp. at 20.

In addition to being ordered by the November 4, 2004 letter to engage in the SFIP exercises, Plaintiff was routinely verbally ordered to engage in the SFIP exercises, as affirmed by Plaintiff's Commander.  6/8/17 Pl. Resp. at 20; 6/8/17 Pl. Resp. Ex. 7 at 1 (Rowlands) ("[Plaintiff] was formally enrolled in the Self-Paced Fitness Improvement Program (SFIP) [and] was ordered to exercise at least five times per week performing the exercises mandated by the Fitness Program."). In fact, Plaintiff's Commander referred to AFI 10-248, that permitted him to order members to enroll in the SFIP to exercise five times a day.  6/8/17 Pl. Resp. at 20; *see also* 6/8/17 Pl. Resp. Ex. 7 at 2.  Plaintiff's direct supervisor also was aware that Plaintiff "was ordered to perform the exercises mandated by the fitness program[.]"  6/8/17 Pl. Resp. at 20; 6/8/17 Pl. Resp. Ex. 8 at 1 (Snowman).  In addition, "[Plaintiff] was performing ordered military training in the SFIP when he suffered his stroke. Because the SFIP meets the definition of 10 U.S.C. § 101(d)(7)(B), [Plaintiff] was in [military] status doing [IDT]."  6/8/17 Pl. Resp. at 20; 6/8/17 Pl. Resp. Ex. 8 at 6 (Snowman).  In addition, the USAFR's Chief Customer Support affirmed that Plaintiff was ordered to exercise under the SFIP.  6/8/17 Pl. Resp. at 21; 6/8/17 Pl. Resp. Ex. 9 at 1 (Bingham) ("[Plaintiff] reports he was ordered to run, and this was consistent with the wing's emphasis on running and directing members to exercise[.]").  Therefore, "[b]ecause [Plaintiff] was ordered to exercise, he was performing IDT, as defined in 10 U.S.C. § 101(d)(7)(B)."  6/8/17 Pl. Resp. at 21.

The Government incorrectly argues that Plaintiff was not engaged in IDT, because the foundation for the Government's argument is Plaintiff's SMSgt's statement, that relies on no documented authority or regulation and only expressed a personal opinion that the SFIP is voluntary and cannot be enforced.  6/8/17 Pl. Resp. at 21; *see also* Pl. Resp. Ex. 7.  The Government adds that a service member cannot be on IDT without filing a Form 40A that provides compensation in pay or points for service, but this assertion is "simply factually and legally incorrect and is supported by no authority[.]"  6/8/17 Pl. Resp. at 21.  The definition of IDT in 10 U. S.C. § 101(d)(7) does not mention any requirement for compensation or Form 40A.  6/8/17 Pl. Resp. at 22.  In fact, a Form 40A can only issue compensation for a four-hour block of time, so any IDT under four hours, such as the SFIP, is not required to be and is not documented by a Form

40A.  6/8/17 Pl. Resp. at 22.  Plaintiff's affidavit cites IDT examples that do not require a Form 40A, because they were less than four hours.  6/8/17 Pl. Resp. Ex. 6 at ¶¶ 16–22.  In any event, a Form 40A does not constitute authority for determining whether a Reservist is in IDT.  6/8/17 Pl. Resp. at 22.

The Government also relies on AFI 10-248 ¶ 1.12.9.4, stating that participation in the SFIP is "encouraged," but this argument overlooks the fact that the AFI sets the minimum requirements for those who fall under its authority and does not control the extent to which the AFI is implemented, *i.e.*, that participation can be mandated.  6/8/17 Pl. Resp. at 22 (citing AFI 10-248 ¶ 1.12.9.4).  As Plaintiff's MSgt notes, however, the SFIP was imposed on members more forcefully than the AFI's language suggests.  6/8/17 Pl. Resp. at 22; 6/8/17 Pl. Resp. Ex. 9 at 1 (Bingham) ("The AFI 10-248 in effect between 26 May 2004 and 24 Sep[tember] 2006 did not prohibit ordering or otherwise requiring [service] members to exercise.").  Moreover, Attachment 15 to AFI 10-248 contemplates potential adverse consequences, as the title "Fitness Program Adverse Event Reporting Format" suggests, and the requirement to document any significant injury associated "with either fitness program assessment, unit physical training or [the] SFIP exercise, on or off duty."  6/8/17 Pl. Resp. at 23 (quoting AFI 10-248, Attachment 15 at 84) (internal correction omitted).  Therefore, the USAF anticipated injuries related to the SFIP, so that injury reports were required in the event LOD determinations were required—but no injury report was made regarding Plaintiff's injury for a LOD determination.  6/8/17 Pl. Resp. at 23.

Third, Plaintiff was entitled to a LOD determination under AFI 36-2910, because he suffered a permanent disability while on inactive duty.  6/8/17 Pl. Resp. at 24.  The Government relies on MSgt Westmoreland's statement that he never experienced the SFIP to require a LOD, but his experience does not address the circumstances where the SFIP was required and mandated by Command in writing and verbally.  6/8/17 Pl. Resp. at 24.  MSgt Westmoreland also mischaracterizes the use of Form 40A and its use in determining whether a member is on IDT. 6/8/17 Pl. Resp. at 24.  In fact, the Command requires a Form 40A when a service member is training or working for four or more hours, so that any lesser amount of time would not be documented.  6/8/17 Pl. Resp. at 25.

Plaintiff was also entitled to an LOD determination under AFI 36-2910 ¶ 1.5, that provides:

1.5.    When an LOD Determination is Required.  The LOD determination process must be initiated when a member, whether hospitalized or not, has an illness, injury or disease that results in:

*       *       *

1.5.2.  The member's inability to perform military duties for more that 24 hours,

1.5.3.  The likelihood of a permanent disability[.]

AFI 36-2910 ¶ 1.5.

Plaintiff has an illness that renders him unable to perform military duties for more than 24 hours and there is likelihood of a permanent disability; therefore, the Government cannot argue

that Plaintiff was not entitled to a LOD determination.  6/8/17 Pl. Resp. at 25.  AFI 36-2910 ¶ 3.4.2.1, however, requires that "[a]n [i]nformal [LOD] . . . rather than an administrative, must be initiated . . . [w]hen the case involves service aggravated [existing prior to service ("EAPTS")] medical conditions."  6/8/17 Pl. Resp. at 26 (quoting AFI 36-2910).  In this case, Plaintiff was entitled to a LOD determination, because the stroke qualifies as an EAPTS medical condition, because Plaintiff is required to undergo years of treatment for hypertension.  6/8/17 Pl. Resp. at 26–27.  If the USAF had conducted a LOD determination as required by regulation, Plaintiff's duty status and eligibility for a medical retirement would be settled.  6/8/17 Pl. Resp. at 27.

Fourth, Plaintiff's VA Disability Rating meets the requirements set forth in 10 U.S.C. § 1204(4)(B).  6/8/17 Pl. Resp. at 27.  Although the VA has not considered the stroke when providing Plaintiff with a disability rating, Plaintiff received a 40% disability rating from the VA.  6/8/17 Pl. Resp. at 28; *see also* 6/8/17 Pl. Resp. Ex. 5 at 2.  Therefore, Plaintiff's 40% disability rating exceeds the statutorily required 30% rating under 10 U.S.C. § 1204(4)(B).  6/8/17 Pl. Resp. at 28.

### 3.    The Government's Reply.

The Government replies that Plaintiff ignores AFI 10-248.  Namely, paragraph 1.12.9.4 provides: "Member participation in non-duty status is encouraged."  Gov't Reply at 16 (quoting AFI 10-248, ¶ 1.12.9.4.); *see also* AFI 10-248 at 45 ("Since [Reserves] are in a non-duty status, their participation in the [Fitness Improvement Program ("FIP")][18] is not mandated.  Members are highly encouraged to take part on a voluntary basis in all available intervention programs to include an individualized fitness prescription[.]").  These references make clear that Plaintiff was not compelled by the USAF to exercise at the time he suffered the stroke.  Gov't Reply at 16.  Therefore, Plaintiff was on non-duty status at that time.  Gov't Reply at 16.

### 4.    Plaintiff's Sur-Reply.

Plaintiff does not raise any new arguments in the May 18, 2016 Sur-Reply.

### 5.    The Court's Resolution.

The October 9, 2015 Complaint alleges that Plaintiff is entitled to disability retirement, pursuant to 10 U.S.C. § 1204.  Compl. ¶¶ 22, 42.  Section 1204 of Title 10 of the United States Code provides that the Air Force Secretary "may retire [a service] member, with retired pay computed under section 1401 of this title," if the member meets the requirements of 10 U.S.C. § 1204; *see also Asbury v. United States*, 30 Fed. Cl. 417, 419 (1994) ("Members of the Air Force Reserves are entitled to be retired for disability and to receive disability retirement pay after they retire under 10 U.S.C. § 1204[.]").  The service member, however, must: (i) be permanently disabled; (ii) have incurred an injury "while performing active duty or [IDT]"; (iii) not become disabled during a period of unauthorized absence or as a result of the member's intentional misconduct or willful neglect; and (iv) receive a disability rating of at least 30%, if the military

---

[18] AFI 10-248, dated May 26, 2004, in relevant part, provides that "FIP is applicable to AGR and activated Reservists," *i.e.*, it is different than the SFIP.  *Compare* 3/21/16 Pl. Resp. Ex. 1 at 45 (AFI 10-248), *with* 3/21/16 Pl. Resp. Ex. 1 at 46 (AFI 10-248 (explaining that SFIP is applicable to traditional Reservists).

[service] member does not have twenty years of service.  *See* 10 U.S.C. § 1204(1), (2)(B)(i), (3), (4).

The Government does not dispute that Plaintiff's injury is permanent in nature or that his injury was not the result of intentional misconduct or willful neglect.  The October 9, 2015 Complaint alleges, however, that Plaintiff's stroke occurred while participating in the SFIP and therefore during IDT.  Compl. ¶¶ 10, 19, 43.  Section 101(d)(7), in relevant part, defines the term "IDT" as:

> (A) duty prescribed for Reserves by the Secretary . . . under section 206 of title 37 or any other provision of law; and
> (B) *special additional duties* authorized for Reserves by an authority designated by the Secretary concerned and performed by them on a voluntary basis in connection with the prescribed training or maintenance activities of the units to which they are assigned.

Compl. ¶ 10 (quoting 10 U.S.C. § 101(d)(7)) (emphasis added).

The October 9, 2015 Complaint alleges that Plaintiff's participation in the SFIP was a "special additional dut[y]," because he was ordered by his Commander to participate in the SFIP after failing the FA.  Compl. ¶¶ 9, 43.  Therefore, the October 9, 2015 Complaint alleges that Plaintiff was fulfilling a duty instead of being encouraged to voluntarily participate in an unauthorized activity.  Compl. ¶ 9.  Drawing a "reasonable inference" in favor of Plaintiff, the court has determined that the October 9, 2015 Complaint pled sufficient facts to satisfy the elements of 10 U.S.C. § 1204(2)(B)(i).

In addition, the October 9, 2015 Complaint alleges that the USAF failed to "report an adverse event related to [Plaintiff's] participation in the USAF SFIP," that caused no LOD investigation to be performed, although it was required.  Compl. ¶¶ 21, 43.  But for this error, as alleged in paragraphs 21 and 43 of the October 9, 2015 Complaint, a 30% disability rating was warranted, entitling Plaintiff to disability retirement, instead of regular retirement.  Therefore, the court has determined that the October 9, 2015 Complaint alleged sufficient facts to satisfy the elements of 10 U.S.C. § 1204(4).

For these reasons, the court has determined that the facts alleged in the October 9, 2015 Complaint state a claim on which relief can be granted under 10 U.S.C. § 1204.

### H.   Whether The Government Is Entitled To Judgment On The Administrative Record.

#### 1.   The Government's Argument.

In the alternative, the Government argues that it is entitled to judgment on the Administrative Record, because the AFBCMR's rejection of Plaintiff's claim is supported by substantial evidence.  5/8/17 Gov't Mot. at 19.  As a matter of law, military personnel decisions may be reviewed only as to whether they are arbitrary, capricious, in bad faith, unsupported by substantial evidence, or contrary to law, regulation, or published procedure.  *See Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1989) ("Review of the administrative decision is limited to

determining whether the action was arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure of a substantive nature by which the [Plaintiff] has been seriously prejudiced.") (citations and corrections omitted).  The AFBCMR, in denying Plaintiff's claim, concluded that, "other than his own assertions, [Plaintiff] has provided no evidence showing his substantial rights were violated, his case was not properly processed, or he was miscounseled in any way."  5/8/17 Gov't Mot. at 20, App'x at 34–35.  The AFBCMR found the AFBCMR Medical Consultant's opinion to be reasonable, because "there [was] no evidence . . . to validate the accuracy or truthfulness of [Plaintiff's] allegation after over five years since the alleged events occurred," and, as such, "the evidence presented did not demonstrate the existence of material error or injustice[.]"  5/8/17 Gov't Mot. at 21, App'x at 35.  These findings are supported by substantial evidence.  5/8/17 Gov't Mot. at 21.

The AFBCMR found Plaintiff's *post hoc* claims that he suffered a stroke after running earlier that day credible, but that made no difference, because Plaintiff failed to meet his burden to show that he was in a military status when he was engaged in the SFIP activity.  5/8/17 Gov't Mot. at 21 (citing 5/8/17 Gov't Mot. App'x at 56 ("[T]here is no documentation to show [Plaintiff] was in a military status at the time of [the stroke].")).

In addition, the Government argues that Plaintiff's pre-discharge medical and personnel records produced in response to the court's August 30, 2016 Order should end this case.  *See* 5/8/17 Gov't Mot. at 21 (citing 5/8/17 Gov't Mot. App'x at 22–25, 74, 76, 77, 79, 84).  These documents did not discuss Plaintiff's SFIP activity on the day of the stroke.  5/8/17 Gov't Mot. at 21.  This affirms that the AFBCMR's decision was adequately supported in finding that "the evidence presented did not demonstrate the existence of material error of injustice."  5/8/17 Gov't Mot. at 21, App'x at 35.

## 2.    Plaintiff's Response.

Plaintiff responds that he is entitled to judgment on the Administrative Record since the AFBCMR's denial of Plaintiff's claim was arbitrary, capricious, and unsupported by substantial evidence.  6/8/17 Pl. Resp. at 29.  In ruling on such a motion, "correction boards must examine relevant data and articulate satisfactory explanations for their decisions."  6/8/17 Pl. Resp. at 29 (quoting *Van Cleave v. United States*, 70 Fed. Cl. 674, 679 (2006)).  But, the AFBCMR decision reported that the Medical Consultant did not have sufficient medical records or documentation to determine whether the USAF provided Plaintiff with an adequate medical assessment prior to entering the SFIP.  6/8/17 Pl. Resp. at 30 (citing AR at 77–81).  This situation was "entirely [due to the USAF]'s failure to maintain [Plaintiff]'s medical records."  6/8/17 Pl. Resp. at 30.  Indeed, the Medical Consultant to the Board stated that "the more appropriate venue for validation of these alleged failures would have been . . . in a Court of Law."  6/8/17 Pl. Resp. at 30 (quoting AR at 80).  The AFBCMR also stated that an independent analysis of the adequacy or appropriateness of Plaintiff's care could not be made.  6/8/17 Pl. Resp. at 30 (citing AR at 80).  In fact, the VA awarded Plaintiff disability benefits after the AFBCMR's decision, due to his high blood pressure during active duty.  6/8/17 Pl. Resp. at 30 (citing 6/8/17 Pl. Resp. Ex. at 5).

The AFBCMR also incorrectly refused to make a determination with respect to the USAF's denial of Plaintiff's request for a LOD determination, stating, "[s]hould the [AFBCMR] determine,

through separate legal analysis of Air Force policies, that the applicant's participation in the SFIP should have been considered IDT . . . the Medical Consultant is prepared to re-address the applicant's eligibility for processing." 6/8/17 Pl. Resp. at 31. Although the record before the AFBCMR was replete with testimony and documentation indicating that Plaintiff was ordered to engage in the SFIP exercise that was the proximate cause of the stroke, the AFBCMR's decision was arbitrary, because it did not address the evidence and reached a conclusion without any analysis. 6/8/17 Pl. Resp. at 31.

Finally, Plaintiff's Command submitted sufficient evidence to the AFBCMR to confirm that Plaintiff was on IDT. 6/8/17 Pl. Resp. at 31. Plaintiff cites to *Wood v. Nicholson*, U.S.C.A.V.C., No. 04-2359, July 14, 2006, wherein the Veterans Affairs Board determined there was IDT, based on the testimony of plaintiff's Command. 6/8/17 Pl. Resp. at 31 (citing 6/8/17 Pl. Resp. Ex. at 191–93). In *Wood*, the appellant was injured in a motorcycle accident. 6/8/17 Pl. Resp. Ex. at 191. The Administration Officer at the appellant's Reserve Office submitted a letter stating that the appellant was on his way traveling to a meeting site for active duty assignment, but the Board denied the appellant's claim for a service-related injury. 6/8/17 Pl. Resp. Ex. at 191. The United States Court of Appeals for Veterans Claims, however, reversed the Board's ruling that statements from an Administration Officer were insufficient to establish the member's duty status. 6/8/17 Pl. Resp. Ex. at 192–93. In another case, the Veteran's Appeals Board also found that service members commuting from a voluntary function were in IDT status, based on the supporting testimony of the veteran's Commanding Officer. 6/8/17 Pl. Resp. at 32 (citing Citation Nr. 9808022 (March 18, 1998)). In this case, Major Rowlands and Captain Snowman both submitted signed statements indicating that Plaintiff was ordered to engage in the SFIP exercises. 6/8/17 Pl. Resp. at 32 (citing AR at 56–60). These statements constitute sufficient evidence to determine that a service member is on IDT, as defined by 10 U.S.C. § 101(d)(7)(B). 6/8/17 Pl. Resp. at 32–33. Therefore, the AFBCMR should have provided Plaintiff with a LOD determination, instead of disregarding the issue and denying him a disability retirement. 6/8/17 Pl. Resp. at 33. Plaintiff therefore requests judgment on the Administrative Record in his favor, because the AFBCMR's decision was arbitrary and capricious, and unsupported by substantial evidence. 6/8/17 Pl. Resp. at 33. If the court elects not to grant the Cross-Motion, Plaintiff requests that the AFBCMR's decision be returned below for a LOD determination that will trigger a reexamination of the records and medical opinions. 6/8/17 Pl. Resp. at 33.

### 3.      The Government's Reply.

The Government replies that substantial evidence exists to demonstrate the AFBCMR's decision was proper and Plaintiff's persistence "only demonstrates his claim is contrived and he failed to meet his burden of production." 6/22/17 Gov't Reply at 12 (corrections omitted). First, the conclusion the AFBCMR reached was that Plaintiff did not provide sufficient relevant evidence to demonstrate the existence of an error or injustice, because "other than his own assertions, he provided no evidence showing his substantial rights were violated, his case was not properly processed, or he was miscounseled in any way." 6/22/17 Gov't Reply at 13 (quoting AR at 8–9). The AFBCMR reached this conclusion by adopting the opinions from the Office of Primary Responsibility (OPR), and the AFBCMR Medical Consultant. 6/22/17 Gov't Reply at 13 (citing AR at 9). The AFBCMR observed that the OPR stated that "there is no documentation to show [Plaintiff] was in a military status at the time of [the stroke]." 6/22/17 Gov't Reply 13 (quoting AR at 76); *see also* AR at 80 (the Medical Consultant stating that "his participation was not likely

considered IDT"). This conclusion is supported by the fitness regulation in effect at the time, that defines the SFIP as non-duty status. 6/22/17 Gov't Reply at 13; *see also* AFI 10-248, ¶ 1.12.9.4 ("Member participation in non-duty status is encouraged."). It is also supported by the lack of any written authorization to show that Plaintiff was otherwise on IDT. 6/22/17 Gov't Reply at 13–14; *see also* AFI 36-2254 ¶ 4.2.1.1 (stating that all IDT must "[h]ave advance written authorization from the member's [C]ommander"). Moreover, the burdens of production and proof are on the service member seeking correction of records. 6/22/17 Gov't Reply at 14; *see also* AFI 36-2603 ¶ 4.1. As the Administrative Record undisputedly contained no evidence that Plaintiff was in a duty status, substantial evidence exists that Plaintiff failed to meet his burden. 6/22/17 Gov't Reply at 14.

### 4.    Plaintiff's Sur-Reply.

Plaintiff replies that the AFBCMR's decision is not supported by substantial evidence and he is entitled to Judgment On The Administrative Record. 6/29/17 Pl. Sur-Reply at 14–15. Plaintiff can show that the "[AFBCMR]'s decision [is] arbitrary and capricious if the Board fails to consider an important aspect of a problem, offers an explanation for its decision that runs counter to the evidence before the Board[,] or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." 6/29/17 Pl. Sur-Reply at 15 (quoting *Frey v. United States*, 112 Fed. Cl. 337, 346 (2013) (internal quotation marks omitted)). The Government has not and cannot excuse the fact that the AFBCMR decision was rendered without substantial evidence, that was solely within the USAF's control. 6/29/17 Pl. Sur-Reply at 15. Specifically, the AFBCMR decision did not consider Plaintiff's medical records and Plaintiff's Command provided sworn statements that Plaintiff was on IDT at the time of the stroke. 6/29/17 Pl. Sur-Reply at 15.

First, there are certain "exceptional circumstances where the court may consider new evidence that was not before the corrections board," *Miller v. United States*, 119 Fed. Cl. 717, 730 (2015) (citing *Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006)), and this case is one where exceptional circumstances exist. 6/29/17 Pl. Sur-Reply at 15–16. Specifically, supplementation of the record is permitted in cases in which "the omission of extra-judicial evidence precludes effective judicial review." 6/29/17 Pl. Sur-Reply at 16 (quoting *Axiom Resource Mgt. Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009)). Here, despite the court's August 30, 2016 Order, the USAF did not provide the full breadth of Plaintiff's records and the AFBCMR Medical Consultants rendered their opinions without the substantial amount of medical records in Plaintiff's file. 6/29/17 Pl. Sur-Reply at 16. Therefore, this has not changed the fact that the Medical Consultant's memorandum to the AFBCMR recommending denial summarily stated that an independent analysis of the adequacy or appropriateness of his case cannot be made "without adequate evidence predating the stroke." 6/29/17 Pl. Sur-Reply at 17 (quoting AR at 81). But, most of the medical and other evidence in the record was never reviewed by the consultants. 6/29/17 Pl. Sur-Reply at 17. "It appears that the USAF's submission to the [c]ourt is merely the aggregate of unofficial records that [Plaintiff] originally produced to the AFBCMR or the VA, and not any Air Force records in existence, but which have somehow gone missing." 6/29/17 Pl. Sur-Reply at 17. To the best of his ability, Plaintiff provided those missing records, but the AFBCMR never produced these records for the consultants. 6/29/17 Pl. Sur-Reply at 17.

Second, the Government incorrectly argues that the reports of Dr. Goodyear and Dr. Early carry no weight. 6/29/17 Pl. Sur-Reply at 18. This contention is based on the fact that these doctors reviewed the limited unofficial records provided to them by Plaintiff and were not contemporaneous with the events at issue in 2006. 6/29/17 Pl. Sur-Reply at 17. But, this statement of the situation does not affect the validity of their conclusions, because the time at which medical records are reviewed and interpreted does not affect the ultimate conclusion, based on careful review and evaluation. 6/29/17 Pl. Sur-Reply at 17. Thus, the Government's argument lacks weight in this regard. 6/29/17 Pl. Sur-Reply at 17.

Third, the USAF attacks its own doctor's credibility by stating that Colonel Savory's notes contained obvious errors. 6/22/17 Gov't Reply at 19. It is true that Dr. Savory confuses the dates on which the stroke occurred, but it does not change the fact that Dr. Savory admits that Plaintiff's symptoms "started approximately mid-day and as the day progressed [Plaintiff] noted he had increasing problems." 6/29/17 Pl. Sur-Reply at 18 (quoting AR at 154). Therefore, Plaintiff clearly discussed his afternoon symptoms with Dr. Savory who attributed the stroke to Plaintiff's afternoon run, but the Government did not acknowledge this testimony. 6/29/17 Pl. Sur-Reply at 18.

Fourth, the USAF incorrectly argues that Plaintiff's claim is contrived and that Plaintiff's counsel is engaging in "semantic gymnastics." 6/29/17 Pl. Sur-Reply at 18. The Government merely notes that Plaintiff's earlier recitations of his injury event in September 2006 became more detailed over time, but this is because Plaintiff has been asked repeatedly over time by medical providers and others to explain what happened. 6/29/17 Pl. Sur-Reply at 18. Therefore, Plaintiff provided more details in response to the questions. 6/29/17 Pl. Sur-Reply at 18. At no point has Plaintiff's explanation ever been inconsistent with any other explanation. 6/29/17 Pl. Sur-Reply at 18. Plaintiff's symptoms upon arriving at the hospital were much different than his symptoms during his afternoon run, and therefore he did not immediately consider the two related. 6/29/17 Pl. Sur-Reply at 19. He began to understand his situation further once the official diagnosis had been presented. 6/29/17 Pl. Sur-Reply at 19. The Government fails to recognize, however, that Plaintiff did explain the afternoon running incident to Colonel Savory, who documented it in his February 4, 2007 notes. 6/29/17 Pl. Sur-Reply at 19 (citing AR at 151–54).

### 5.      The Court's Resolution.

The United States Court of Appeals for the Federal Circuit has held that the United States Court of Federal Claims "will not disturb the decision of [a board for correction of military records,] unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005). Although the court "might disagree" with a correction board's decision, that is not a sufficient basis on which to conduct a *de novo* review in order to overturn that decision. *See Storey v. United States*, 531 F.2d 985, 987 (Ct. Cl. 1976) (A decision of a "[c]orrection [b]oard is entitled to finality and may not be overturned, even if the court might disagree with it[.]"). In this case, Plaintiff submitted his claim of entitlement to disability benefits to the AFBCMR, but subsequently, both parties have submitted supplemental declarations of relevant witnesses. 6/8/17 Pl. Resp. Exs. 10, 11;  6/22/17 Gov't Reply App'x at 102–03. In addition, pursuant to the court's November 9, 2011 Order, the VA provided Plaintiff with his STRs and USAF medical records. *See* 1/11/17 Gov't Notice Of

Compliance.  The examination of these new witnesses and relevant records warrants review and reconsideration by the AFBCMR.

## IV.    CONCLUSION.

For these reasons, the Government's May 8, 2017 Motion to Dismiss is denied.  The Government's May 8, 2017 Motion For Judgment On The Administrative Record is denied. Plaintiff's June 8, 2017 Cross-Motion For Judgment On The Administrative Record is granted.

The AFBCMR's February 28, 2013 decision denying Plaintiff's Application For A Correction Of Military Records is vacated and remanded for 120 days to the AFBCMR, at 1500 West Perimeter Road, Suite 3700, Joint Base Andrews NAF, Washington, Maryland 20762, to reconsider Plaintiff's Application For A Correction Of Military Records in light of the new evidence presented by the parties.  *See* RCFC 52.2(a), (b)(1)(B).

On December 22, 2017, the parties will file a Joint Status Report with the court advising the status of the remand and reconsideration proceedings, pursuant to RCFC 52.2(b)(1)(D).  Within ten days of the AFBCMR's reconsideration decision, the parties will file a Joint Status Report with the court advising whether: (1) the remand affords a satisfactory basis for disposition of the case; or (2) further proceedings are required.  *See* RCFC 52.2(b)(1)(D), (f)(1).  This case is stayed during the remand and reconsideration period.  *See* RCFC 52.2(b)(1)(C).

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Chief Judge**